761 A.2d 949

Mary S. WELSH

v.

Timothy E. WELSH.

No. 2257, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Oct. 2, 2000.

Reconsideration Denied Dec. 7, 2000.

Edward H. Kerman, (Michael G. Imber on the brief), Rockville, for appellant.

Karen D. Amos (Fred Howard Silverstein and Silverstein & Ostovitz, LLC on the brief), Ellicott City, for appellee.

Argued before DAVIS, SONNER and PAUL E. ALPERT (retired, specially assigned), JJ.

DAVIS, Judge.

Appellant Mary S. Welsh was granted a Judgment of Absolute Divorce from appellee Timothy E. Welsh in the Circuit Court for Carroll County on September 27, 1999. Appellant initially filed an action for divorce on grounds of adultery in the spring of 1994 in the Circuit Court for Howard County. The case was subsequently transferred to the Circuit Court for Carroll County in June 1994 because all of the circuit court judges sitting in Howard County recused themselves.[1] Appellee filed a counterclaim for divorce on grounds of a two-year separation. The court ordered that appellee pay appellant $500 per week as pendente lite alimony and permit her use of a condominium owned by the parties. On December 6, 1996, appellant filed an interlocutory appeal protesting three rulings on motions made by the court. We filed an unreported opinion in the matter, *Welsh v. Welsh*, 117 Md.App. 756, No. 103, September Term 1996, (October 15, 1997), and thereafter the case proceeded to trial on the merits on each parties' amended complaint in March 1999 and again in June 1999. The circuit court's Judgment of Divorce was issued on Sep-

---

1. Appellee had previously been a Howard County Assistant State's Attorney and the County Solicitor and thereby was well known to members of the Howard County bench.

tember 27, 1999 and both parties filed separate Motions to Alter or Amend Judgment on September 6 and 7, 1999, respectively. The court denied both motions on October 26, 1999 and this appeal ensued.

Appellant raises five questions for our review and appellee filed a cross-appeal raising six questions. Because some of these questions address the same issues we list them together, rephrased and renumbered as follows:

I. Did the circuit court err in denying appellant alimony?

II. Did the circuit court err in denying either party an award of attorney's fees?

III. Did the circuit court err in calculating the monetary award to appellant and denying appellee a monetary award?

IV. Did the circuit court err in granting appellee an award of development fees relating to the marital real property?

V. Did the circuit court err in granting appellant an award of one-half of the attorney's fees appellee expended in another lawsuit using marital funds?

VI. Did the circuit court err in granting appellant one-half of appellee's retirement on an "as, if, and when" basis?

VII. Did the circuit court err in ordering appellant liable for any future judgment or settlement relating to possible litigation with the Bassler Hunt Partnership?

VIII. Did the circuit court err in allowing the court-appointed trustee to retain the same powers concerning the sale of the marital home and an accompanying building as set forth in an Order dated August 31, 1995?

IX. Did the circuit court err in vacating the Order of December 2, 1996 after the interlocutory appeal, thereby violating the mandate of this Court?

XI. Did the circuit court err in granting appellant a divorce based on a two-year separation, instead of awarding the divorce to appellee?

We answer questions one through six and eight through ten in the negative and question seven affirmatively, thereby affirming in part and reversing in part the judgment of the circuit court.

## FACTUAL BACKGROUND

The parties were married in 1961 and four children were born of the marriage, all of whom are now emancipated. In 1972, the couple purchased a twenty-two acre property with a twenty-two room manor home known as Font Hill Manor Farm (Font Hill), with accompanying buildings, one of which is known as the Dairy Barn/Chilling House, which appellee uses as an office.

Appellee is sixty-one years of age and holds an undergraduate accounting degree and a law degree. From 1961 to 1966 he worked for the Internal Revenue Service while earning his law degree and thereafter he opened his own law practice. From 1969 to 1973, appellee was employed as an Assistant State's Attorney for Howard County and, from 1979 through 1987, he was the Howard County Solicitor. He taught business, law, and accounting courses from 1968 to 1996 at Catonsville Community College in Baltimore County. Additionally, he holds a real estate broker's license and is president of the Welsh Company, of which he owns eighty-five percent; the couple's only daughter owns fifteen percent. The value of appellee's stock in that company is a reported $1,062.50.

Appellant is fifty-nine years of age and holds a high school degree with one year of practical nursing training. She has not worked in the nursing field for thirty-five years and primarily cared for the children and marital home throughout the marriage. After leaving Font Hill on April 10, 1994, appellant filed for divorce. The case was subsequently transferred from the Circuit Court for Howard County to the Circuit Court for Carroll County. In May 1996, the court

ordered that appellee pay appellant $500 per week in *pendente lite* alimony and also provided that she occupy a condominium, known as Vantage Point, owned by the couple, with expenses for that dwelling to be paid by the court-appointed trustee. Appellee continued to reside in the Font Hill home.

In 1993, the marital property was rezoned into three parcels. The first parcel (Section One) consisted of ten single-family dwelling lots; the second parcel (Section Two) consisted of twenty-six single-family dwelling lots, including the Dairy Barn/Chilling House; the third parcel (Section Three) consisted of 3.32 acres on which the Font Hill home was located. The parties entered into a contract in 1994 to sell the lots in Section One and received a total of $923,927.50. In February 1999, the parties entered into a contract to sell the lots in Section Two, for which they received a total of $1,812,-500.

Additional facts will be provided as they become relevant to our discussion of the issues raised in this appeal.

## DISCUSSION

### I

Appellant first contends that the court erred when it denied her request for permanent alimony. She explains that, despite the proceeds received from the sale of the lots on the Font Hill property and from the eventual sale of the Font Hill marital home, she is not in a position to become self-supporting. Additionally, she contends that appellee is in a superior financial position due to various tax benefits he will receive and, therefore, the parties' financial status will be unconscionably disparate, thus warranting an award of alimony.

█ Appellant first argues that the court could have awarded appellant the divorce based on her claims of adultery because she provided sufficient evidence to prove appellee's adulterous activities. In its opinion, however, the court specifically states that appellant's evidence "failed to establish the disposition and opportunity to commit adultery required by

*Pohzehl v. Pohzehl,* 205 Md. 395, 109 A.2d 58 (1954) and its progeny." We note that the court went on to conclude specifically that, at trial, appellee conceded that his relationship with a woman had progressed to a sexual one after the parties had separated.

It is ultimately up to the court, based on its fact finding, to declare the grounds for divorce. It is not reasonable that the court be obligated to grant the divorce on the grounds requested when the judge is more persuaded that it is more likely than not that other grounds for the divorce are more justified. The court explained in its opinion that it found that the relationship between appellant and appellee had deteriorated long before appellant actually left the marital home in April 1994. Indeed, the court comments that the couple did not have sexual relations for nearly two decades and opines that the marriage evolved into one "of convenience." Although appellee acknowledged having sexual relations with another woman while the couple was separated, it is clear that the court was not satisfied by the evidence presented that appellee had engaged in adulterous activities while the couple was still living together. Even more significant, the court did not believe that appellee's relations with another woman were, in fact, the reason for the break up of the marriage. Based on the evidence presented, we do not perceive any error in the court awarding appellant the divorce based on a two-year separation, rather than adultery.

Appellant apparently argues the issue of adultery in the hopes that a divorce based on those grounds would favor an award of indefinite alimony. The Court of Appeals, however, has specifically held that alimony is "never a punitive measure." *Danziger v. Danziger,* 208 Md. 469, 474, 118 A.2d 653 (1955). Adultery is merely one factor to be considered when the court addresses an award of alimony in determining the circumstances that contributed to the breakup of the marriage. MD.CODE (1999 Repl.Vol.), Fam. Law (F.L.) § 11–106(b)(6). What is significant in the instant case is the court's evaluation of this factor. Its opinion states that "[t]estimony

revealed that the parties' relationship had deteriorated long before [appellant] left the marital home in April of 1994." Despite appellant's attempts to emphasize appellee's adulterous behavior, the court was convinced that the relationship between the parties did not end because of any adulterous activities on the part of appellee. The trial court is in the best position to observe the witnesses and judge their credibility; as we see it, the court's analysis of the deterioration of the parties' relationship was not clearly erroneous. *See* MD. RULE 8–131 (2000).

█ Appellant additionally contends that the court erred in failing to award alimony because it ignored the criteria set forth in F.L. § 11–106. To the contrary, the court separately enunciated each of its findings under a heading for each factor to be considered. The court stated that, "[a]fter careful consideration of all the factors necessary for a fair and equitable alimony award determination, including the above factors, the [c]ourt declines to award [appellant] rehabilitative or indefinite alimony, primarily due to the significant amount of assets involved in this case." It is not mandatory that the court provide a formal checklist of each factor, as was provided in the instant case. *Gallagher v. Gallagher,* 118 Md.App. 567, 586, 703 A.2d 850 (1997), *cert. denied,* 349 Md. 495, 709 A.2d 139 (1998). The court must, however, demonstrate consideration of the required factors. *Id.* The court clearly made the proper considerations as mandated by the statute and beyond. We cannot say it abused its discretion.

█ In its evaluation of factor one—"the ability of the party seeking alimony to be wholly or partly self-supporting"—the court wrote:

> The parties to the actions have substantial personal assets. Both parties received a significant amount of money from the Pulte Contract of Sale, and will receive additional large sums of money from the sale of the marital home and [C]hilling [H]ouse. The [c]ourt therefore finds that [appellant] has the ability to be wholly self-supporting.

The court found under factor two—"[t]he time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment"—that, "based upon the substantial assets involved in this case, [appellant] may not need to seek employment." The court also observed that appellant's financial statement revealed that her monthly expenses were minimal. Appellant contends that these findings are erroneous and that the court did not properly take into consideration the tax benefits derived by appellee, not available to appellant, and that the evidence showed that she is clearly not self-supporting.

Appellant explains that, because appellee continued to occupy the marital home, he will be entitled to a significant tax benefit. That benefit, in combination with other tax benefits, will result in appellee realizing a tax exemption of about $600,000, whereas appellant will not receive any such tax exemptions for the money she received or will receive for the sale of the marital home or the other income generated to her for the sale of the couple's marital real property. Appellant contends that, as a result of these tax benefits, her income will be unconscionably disparate from appellee's income and he will be able to afford alimony and, therefore, she is entitled to an award of indefinite alimony. We disagree.

Family Law Article § 11–106(c) provides that the court may award indefinite alimony in only two circumstances. The first addresses the infirmity or disability of one of the parties, which is inapplicable here. The second applies when the party seeking alimony makes as much progress as possible toward becoming self-supporting and, despite those efforts, the parties' respective standards of living will be unconscionably disparate. The fact that appellant will not receive the same tax benefits as appellee does not necessarily mean that their standards of living will be unconscionably disparate. Nor does the fact that appellant would be in a position to afford alimony mean the court will order it.

The court determined that the amounts appellant received in the contract for the development of Section Two of the Font

Hill marital property, in addition to the proceeds that she will receive from the sale of the marital home at Font Hill and the Dairy Barn/Chilling House, will place her in a position to sustain her standard of living. In other words, with or without tax benefits, the amounts received are sufficient for the parties to sustain their standards of living.

Appellant provided the court with evidence of the tax benefits of which appellee could take advantage and we assume that the court correctly weighed that evidence in the context of determining if the parties' standards of living would be unconscionably disparate. Moreover, the court evaluated the income in relation to the parties' financial reports, which showed appellee made no income in 1995, 1996, 1997, and 1998, and showed that appellant, while also earning no income in those years, had minimal expenses. In *Holston v. Holston,* 58 Md.App. 308, 323, 473 A.2d 459 (1984), we observed that a large disparity in the standards of living will not necessarily mandate an award of indefinite alimony; rather, the court has the discretion to make such an award upon such a finding. Appellant clearly did not prove to the court's satisfaction that the parties' standards of living would be so different that it would warrant an award of indefinite alimony under F.L. § 11–106(c)(2) and we do not find the court's ruling to be clearly erroneous.

As we explain *infra,* however, it is clear from the record that the monetary award and alimony may have been affected by the court's imposition of potential liability of the Bassler Hunt Partnership on appellant. Accordingly, we remand this case for reconsideration of the monetary award, which will also require a redetermination of alimony. *Rogers v. Rogers,* 80 Md.App. 575, 588, 565 A.2d 361 (1989).

## II

Both parties dispute the trial court's decision not to award either party attorney's fees. Concerning appellant's legal fees of more than $200,000, the court stated:

[T]he [c]ourt *does* find that [appellant's counsel's] bill is unreasonable because [appellant] was billed for two attorneys at nearly every stage of this case, thus making the hourly rate $350.... The [c]ourt wholeheartedly agrees with the following assertion by [appellee's] counsel in his closing argument: "Many of [appellant's] attorney's fees were incurred as a result of her own counsel's refusal to make a good faith effort at settlement and his desire to obstruct all attempts at an amicable resolution of any issue which has arisen in this case over the last five (5) years." Thus, many of [appellant's] legal bills should not have been incurred *at all,* regardless of their hourly rate.

The court went on to conclude that appellant's counsel became inappropriately personally involved in the instant case and, as a result, unnecessarily protracted the litigation.

The court proceeded to consider the factors required F.L. § 11–110(c): 1) the financial resources and financial needs of both parties, and 2) whether there was substantial justification for prosecuting or defending the proceeding. The court concluded that there was substantial justification, although it made a point to state that "the [c]ourt falls just short of finding a lack of substantial justification on [appellant's] part in prosecuting and defending (against [appellee's] counterclaim) the proceeding." Concerning both parties, the court observed that the substantial assets involved created several discovery disputes and recognized that, when one party makes allegations, the other party must defend. Consequently, the court declined to award attorney's fees to either party for the divorce proceedings.

Appellant argues that she met the two criteria required of F.L. § 11–110(c) and is, therefore, entitled to an award of attorney's fees. Appellant's disagreement with the findings of the court, however, does not warrant a reversal. Appellant points out that appellee also had two counsel working on his case, in addition to his own appearance entered on his behalf and that the case was vigorously defended, which added to the necessary legal expenses. According to the record, this was a contentious and bitterly fought proceeding. Appellant accuses

the trial court of being biased against appellant, alleging that appellee's aggressive conduct throughout the litigation also unnecessarily protracted the litigation, including two years for appellant to receive a hearing on her *pendente lite* alimony request.

It is clear from the court's opinion that it was convinced that appellant created most of the delays in this case. We note, however, that, despite these observations, the court took pains to review objectively the criteria required of F.L. § 11–110(c) and, indeed, it concluded that there was substantial justification for prosecuting and defending the case, albeit just short of a finding of lack of substantial justification. The court's finding, however, appears to apply to both parties. In other words, both parties had substantial justification for prosecuting and defending the case. Accordingly, the more crucial factor is the financial resources and needs of the parties.

Appellant points to the court's observation that appellant was at a financial disadvantage in the beginning of this litigation to demonstrate that she had a financial need. The court's observation, however, does not consider the subsequent proceeds appellant received and will receive as a result of the sale of the marital properties at Font Hill. The court, after careful evaluation, did not perceive either party at a significant financial disadvantage to warrant an award of attorney's fees.

Appellee claims that he is entitled to an award of attorney's fees because he properly demonstrated his financial need. He explains that his financial statement reflected a deficit each month and that appellant is in a better position to pay his attorney's fees. While appellee asserted that appellant is in a better "position" to pay his attorney's fees, the court determined that his financial resources or needs were insufficient to warrant an award of attorney's fees. Despite the court's acknowledgment that appellant generated unnecessary litigation in the instant case, the court additionally noted that there were several discovery disputes initiated by both sides. The court found that both parties contributed to delays and that

both parties were in a financial position where they could independently afford their attorney's fees.

It is within the court's sound discretion to award such fees and we shall only disturb the court's ruling upon a showing of an abuse of that discretion. *Holston,* 58 Md.App. at 326, 473 A.2d 459. The court's opinion demonstrates a careful evaluation of the statutory criteria and we see no abuse of discretion in its final determination that neither party is entitled to legal fees.

## III

The court ordered that the trustee sell the Font Hill home and that the proceeds of the sale be equally divided among the parties after certain expenses were met. Additionally, a monetary award of $16,441.25 was made to appellant as an adjustment of the equities and rights of the parties. Appellant contends that the monetary award is insufficient and does not constitute an equitable adjustment between the parties. Appellee counters that the court erred in granting appellant any monetary award because it incorrectly weighed the efforts he made to increase the value of the marital property at Font Hill. As explained, *infra,* we remand this case for reconsideration of the monetary award in light of the potential Bassler Hunt Partnership liability. We will, however, address the parties' other concerns relating to the monetary award.

Appellant bases her contention on the fact that the court's lack of award of alimony was in error and because the award of alimony must be adjusted, so must the monetary award. It is well established that, if there is an adjustment of alimony on appeal, the monetary award must also be reconsidered. *Rogers,* 80 Md.App. at 588, 565 A.2d 361; *Prahinski v. Prahinski,* 75 Md.App. 113, 138, 540 A.2d 833 (1988), *aff'd,* 321 Md. 227, 582 A.2d 784 (1990). Because of the error in the determination of the monetary award based on other factors, the lower court will have an opportunity to reconsider it on remand. We further address appellee's contention that the court erred in granting any monetary award at all.

He particularly points to factor eight of the eleven factors that the court must consider in determining a monetary award. Factor eight reads:

(8) how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

F.L. § 8–205(b)(8). Appellee posits that he exerted all the effort to prepare the Font Hill property for subdivision and development and it was those efforts that reaped the purchase prices for the two sections. He contends that much of his effort in preparing and selling Section Two was made after the parties separated and that appellant made no contributions— monetary or non-monetary—to the process. Appellee points out that the statute specifically requires consideration of *how* and *when* the marital property was acquired and suggests that, since his effort after the separation of the parties is what increased the value of the property, the court improperly divided the value of the property equally among the parties.

We observed in *Wilen v. Wilen,* 61 Md.App. 337, 354–55, 486 A.2d 775 (1985), that

[t]he extent to which the efforts of one spouse may have led to acquisition of property or an increase in its value *without any monetary or non-monetary contribution by the other spouse* after the parties separated can, and should, be taken into account in determining what would constitute an equitable monetary award.

(Emphasis added.) The Court of Appeals, in *Alston v. Alston,* 331 Md. 496, 507, 629 A.2d 70 (1993), stated that "the eighth factor should be given greater weight than the others." The Court further noted, however, that the circumstances of each case will dictate when more emphasis on this factor is warranted. *Id.; see also Skrabak v. Skrabak,* 108 Md.App. 633, 654–56, 673 A.2d 732, *cert. denied,* 342 Md. 584, 678 A.2d 1048 (1996). In *Alston,* the Court emphasized factor eight because,

[w]here one party, wholly through his or her own efforts, and without any direct or indirect contribution by the other, acquires a specific item of marital property after the parties have separated and after the marital family has, as a practical matter, ceased to exist, a monetary award representing an equal division of that particular property would not ordinarily be consonant with the history and purpose of the statute.

*Alston,* 331 Md. at 507, 629 A.2d 70.

The circumstances of this case, however, are wholly distinguishable from *Wilen, Alston,* and *Skrabak.* In all three of those cases, there was no dispute that the efforts of the party who acquired the property or increased the value of existing marital property were solely his or her own and that the other party made no direct or indirect contribution to the acquisition or increase in value. The question for the trial court to answer in deciding how heavily it should weigh factor eight, therefore, is whether the increase in value was "dependent in any way on the joint effort of the parties or their shared life, past or present." *Alston,* 331 Md. at 508, 629 A.2d 70.

In the case *sub judice,* the trial court found that appellee's efforts were not so independent that appellant made no contributions to the increase in the value of the Font Hill property. The court noted that the property was acquired by the parties in 1972 and there is no dispute that Font Hill is marital property. The court also observed that the funds appellee used in handling the rezoning and ultimate purchase by developers were marital funds. In his discussion concerning the court's error in granting the monetary award, appellee fails to address the development fees he was awarded by the court. Appellee received a judgment of $135,937.50 against appellant for payment of development fees for his efforts in having the Font Hill property rezoned and subsequently bought by developers. This award was specifically for his efforts in rezoning and ultimately selling the property. Appellee argues that he should receive a monetary award as consideration for his actions that resulted in an increase in the property's value. Although the court's award of $135,937.50 to appellee is in the

form of a separate judgment and is not labeled a "monetary award," it nonetheless compensates appellee for his efforts in preparing the property for development.

We hasten to add that the court's consideration of factor eight was not in error in that the marital property was acquired in 1972 and, in 1993, before the couple separated, they executed a contract for the sale of Section One. The parties were in agreement and appellee had willingly made efforts during the marriage to rezone and sell off portions of the property, which occurred in part before appellant left the marital home. Additionally, the funds used to help appellee's efforts in preparing the sections for sale were marital funds, which is further evidence that the preparation to sell Section Two was a joint effort between the parties. Although it is true that appellee participated in the day-to-day efforts necessary to prepare the property for sale, appellant did not have the expertise to participate in every aspect of the transaction. Appellant did not prevent the marital funds from being used and she executed the necessary paperwork to complete the transaction. We hold, therefore, that the court appropriately weighed factor eight in the context of the other factors.

## IV

As discussed, *supra,* appellee received a judgment of $135,937.50 against appellant for payment of development fees for his efforts in having the Font Hill property rezoned and subsequently bought by developers. Appellant argues that the court erred in calculating the amount because the court based the fee on a percentage of the total purchase price, but appellee only performed one-half of the work necessary for the development of the lots.

Appellant does not dispute the court's use of a development fee of seven and one-half percent of the price, based on expert testimony as to how much such fees run, but instead takes issue with the amount, claiming the court erroneously calculated the fee based on the total purchase price. She explains that the contract entered into with Pulte Homes for the

purchase of Section Two called for "unfinished" lots, which meant that all physical development of the property was to be performed by the purchaser, Pulte Homes, and not appellee. Appellant posits that a fee based on the total purchase price would have only been appropriate if appellee had participated and executed the full development of the property. Because appellee only performed one-half of the development work (getting it prepared for physical development), and he also received one-half of the proceeds of the sale, appellant claims that the court erred and the maximum fee to which appellee is entitled is twenty-five percent of the purchase, which would total $33,984.37. Appellant states that a developer fee is normally charged when the developer is working on behalf of a third party, but in this case, appellee was working for his own benefit and received one-half of the purchase price. Therefore, he is not entitled to the full developer's fee because 1) he did not perform full development services, and 2) he received one-half of the proceeds of the sale. We disagree.

The expert testimony reveals that the amount of the development fee will vary depending on the job, averaging from five to ten percent of the purchase price. The court's opinion indicated that, in making the award of development fees to appellee, it considered the testimony of David Carney, the trustee in the case, and Kevin Rodgers, a developer who bid on the Section Two property of Font Hill and was familiar with the efforts expended by appellee to develop the property. Rodgers testified that the development process is often seen as a three-step process: 1) from raw ground to obtaining proper zoning, 2) from zoning to engineering, and 3) the development. The Pulte contract states that the "sale involves the responsibility of the Buyer to undertake and complete all of the development work as required by the Developer Agreements and necessary to deliver finished single family building lots consistent with the construction drawings prepared by Benchmark Engineering ..." which included sediment control, grading, storm water management, sewer and water installation and public road and storm drain construction. During his direct examination, Rodgers stated that a ten

percent fee would be a reasonable fee to develop fully Section Two of Font Hill.

The court ultimately settled on awarding appellee a development fee of seven and one-half percent. It did not award a fee of ten percent for full development, but decreased it in consideration of his contributions to prepare the property for physical development. Appellee and another witness, Garnett Y. Clark, Jr., testified that appellee's efforts included extensive meetings with Howard County zoning officials and members of the neighborhood to address their concerns about development, including private meetings and public hearings before the county zoning board, writing contracts, coordinating and accepting bids for the development work, and various other matters. Appellant does not dispute that appellee actually performed these functions, but argues that he is not entitled to the full amount awarded by the court because he owned the property and, therefore, received payment for his efforts through his half of the purchase price. The only fee he is due under appellant's approach is seven and one-half percent of her half of the proceeds from the sale.

The court's determination that appellee was entitled to a fee of seven and one-half percent was not an abuse of discretion. The evidence revealed the various efforts expended by appellee in preparing the property for development. The court did not award him the maximum fee of ten percent for full development of the lots, but reduced it based on his development of the property from raw land through the engineering process. This was a reasonable assessment based on the evidence presented. Additionally, appellee would not be entitled to a separate fee because he additionally received proceeds from the sale of the property. The fact that he owned the property did not diminish the various duties he accepted and carried out to develop the property. The expert testimony did not indicate that the fees were only paid to third parties. We, therefore, perceive no abuse of discretion in the court's decision to award appellee a separate development fee based on the full purchase price of the property.

## V

The circuit court's order provides for a judgment against appellee in favor of appellant for $37,000, which represented reimbursement to her for one-half of the amount of attorney's fees appellee expended in a separate lawsuit using marital funds. Appellee argues that, absent a finding that appellee intentionally dissipated the marital funds, the court lacks the authority to make such an award.

The $37,000 awarded by the court represents one-half of $74,000 that appellee expended in à lawsuit against appellant's counsel. The Montgomery County office of appellant's counsel was burglarized on November 9, 1995. The attorney's case file for *Welsh v. Welsh* was missing following that incident. In the course of the police investigation, the police report reflected that appellant's counsel stated to police, "No one would want those files except for Tim Welsh." Thereafter, appellee filed a defamation suit against appellant's counsel. The case ultimately settled for $22,500, but the legal fees expended by appellee totaled $74,000. Appellee conceded that marital funds were used for the payment of those fees. Accordingly, the trial court found that appellant was entitled to reimbursement for one-half of the marital funds expended in that litigation.

Appellee, citing *Jeffcoat v. Jeffcoat*, 102 Md.App. 301, 311–12, 649 A.2d 1137 (1994), states that, in order to receive reimbursement for these expenditures, appellant had the burden to show that appellee expended the funds with the primary purpose of reducing marital funds that would be divided equitably among the parties. He contends that no such intent was proven; therefore, the court erred in the award of $37,-000. We disagree.

In *Jeffcoat*, we primarily discussed the burden of proof requirements for a claim of dissipation of marital funds. *Id.* at 306–12, 649 A.2d 1137. We acknowledged that the party alleging dissipation of funds initially bears the burden to show dissipation has occurred. *Id.* at 311, 649 A.2d 1137. After that party establishes a *prima facie* case of dissipation, the

burden shifts to the party who spent the money to prove appropriate use of the funds. *Id.* We stated that

> [t]he court must determine whether joint funds have been spent for other than family purposes with the intention of reducing the amount of money available to the court for equitable distribution.

*Id.* at 312, 649 A.2d 1137. In the case *sub judice,* the court does not make a specific finding of dissipation. Rather, the court's discussion of appellee's expenditure of the $74,000 in legal fees is under the main heading entitled "MARITAL PROPERTY/MONETARY AWARD" and the subheading "Liabilities/Adjustments/Offsets." The court, in making the award to appellant of $37,000, exercised its general authority under the Maryland Marital Property Act to make "an adjustment of the equities and rights of the parties concerning marital property...." F.L. § 8–205(a).

There is no dispute that the funds appellee expended on the lawsuit against appellant's attorney were marital. In *Jeffcoat,* we evaluated several jurisdictions' approaches to dissipation and noted that, in *Sharp v. Sharp,* 58 Md.App. 386, 401, 473 A.2d 499, *cert. denied,* 300 Md. 795, 481 A.2d 240 (1984), we cited *Klingberg v. Klingberg,* 68 Ill.App.3d 513, 25 Ill.Dec. 246, 386 N.E.2d 517, 521 (1979), which stated:

> Dissipation may be found where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage at a time where the marriage is undergoing an irreconcilable breakdown.

*Jeffcoat,* 102 Md.App. at 308, 649 A.2d 1137. Although our final conclusion in *Jeffcoat* appears to establish that a *prima facie* case of dissipation includes a finding that one spouse spent or otherwise depleted marital funds or property with the principal purpose of reducing the amount of funds that would be available for equitable distribution at the time of the divorce, the consideration enunciated in *Sharp* and *Jeffcoat* is an appropriate one for the court in balancing the equities among the parties.

While there may not have been a *prima facie* case of dissipation established or a specific finding of dissipation, the court, in evaluating the various marital assets and properties of the parties, determined that the $74,000 expended by appellee for his defamation lawsuit was for a purpose unrelated to the marriage and was paid from marital funds at a time when the parties were separated and pursuing divorce proceedings. Additionally, the nature of the lawsuit was such that it solely benefitted appellee and did not confer any benefit to appellant. Accordingly, we hold that the court's award was within its authority granted by the Maryland Marital Property Act and is not clearly erroneous.

## VI

▮▮ Appellant also received an award of one-half of appellee's retirement benefits from the State for his work with Catonsville Community College on an "as, if, and when" basis. Appellee opposes the court's award on that basis and contends that he provided sufficient evidence to demonstrate good cause for the court to disburse the retirement benefit in a lump sum distribution. He does not dispute the court's finding that appellant is entitled to any of his pension benefits, but instead appeals the method of distribution chosen by the court.

Appellee relies on *Ohm v. Ohm*, 49 Md.App. 392, 406–410, 431 A.2d 1371 (1981), in which we examined various jurisdictions and how they value and distribute pension benefits. Appellee points in particular to several guidelines set forth by an Oregon court to follow when making a determination as to what the proper distribution of pension benefits would be. *Id.* at 408, 431 A.2d 1371. One of the enunciated guidelines there was that

> [t]he courts should continue to strive to disentangle the parties as much as possible by determining, where equitable, a sum certain to be paid rather than a percentage based upon expected future contingencies.

*Id.* (quoting *Rogers v. Rogers*, 45 Or.App. 885, 609 P.2d 877, 882 (1980)).

Appellee states that he presented evidence which established the present value of his pension and that, given the parties' lack of communication and long term separation, the court erred in not awarding a lump sum distribution. The Oregon guidelines we observed in *Ohm*, however, were those of just one of many jurisdictions. There we concluded:

> On remand, the chancellor, in valuing the appellant's pension, and in making a monetary award, should give some consideration to the guidelines set forth above.

*Id.* at 409, 431 A.2d 1371. The guidelines set forth in our opinion included guidelines from four different jurisdictions. We did not place the guidelines of one jurisdiction over another as any more important to consider. While appellee may have attempted to persuade the court that a lump sum distribution was preferable because it would serve to disentangle the parties, the court, in considering the other required factors and the evidence before it, was not convinced that a lump sum distribution would best serve to balance the inequities of the parties.

Appellee also argues that, given the substantial marital property involved, the court could have awarded appellant a larger distribution of marital property, thereby offsetting any inequities created by a lump sum distribution of the pension. In determining the proper monetary award to be given in a case, the court is required to "reach a fair and equitable award after consideration of each of the factors set forth in [F.L. § 8–205(b) ]." *Id.* at 405, 431 A.2d 1371. In Maryland, we recognize three methods of pension valuation.[2] *Imagnu v. Wodajo*, 85 Md.App. 208, 214, 582 A.2d 590 (1990); *see also Deering v. Deering*, 292 Md. 115, 131, 437 A.2d 883 (1981). Which method is appropriate depends on the circumstances of the individual case. *Id.* As appellee properly points out, even

---

**2.** The first method places value on the pension based on the employee's contributions, plus accrued interest. The second method assesses the present value of future benefits the employee is expected to receive after retirement and involves some actuarial speculation. The third method awards a fixed percentage to the non-employee spouse, payable "as, if and when" received. *See Imagnu*, 85 Md.App. at 213–14, 582 A.2d 590.

if a pension payment on an "as, if, and when received" basis is available, this does not mandate that the court adopt that method. *Cotter v. Cotter,* 58 Md.App. 529, 540–41, 473 A.2d 970, *cert. denied,* 300 Md. 794, 481 A.2d 239 (1984).

At trial, appellee presented evidence as to why he thought the lump sum distribution was the most appropriate. Appellant did not express a preference in her testimony but did present evidence concerning the "as, if, and when" distribution method. Ultimately, the court awarded appellant one-half of appellee's pension based on the "as, if, and when" method. The court was obviously persuaded by appellant's evidence that the "as, if, and when" method would yield the greater benefit to the parties. It found that

> evidence produced by [appellant] (in [appellant's] Ex. # 49) revealed that the maximum projected monthly retirement benefit paid by the retirement programs would be greater than if the money were withdrawn and invested in a similar investment vehicle. The court will therefore order that the proceeds be distributed on an if, as, and when basis [sic] and will prepare the appropriate Qualified Domestic Relations Order.

From the court's finding, it is clear that an award to appellant of additional marital property from the couple's assets would be too speculative to compensate her for potential earnings from appellee's pension plan.

Additionally, we recognize that the court has broad discretion in evaluating pensions and retirement benefits, and in determining the manner in which those benefits are to be distributed. *Imagnu,* 85 Md.App. at 216, 582 A.2d 590. Considering that every issue in this case was bitterly contested, we believe the court wisely divided the couple's property as evenly as possible in an effort to minimize the various disputes that could arise from its ruling. While division of marital property in Maryland is not always equal, but rather equitable, *Ohm,* 49 Md.App. at 405, 431 A.2d 1371, the court clearly attempted to divide the property as evenly as possible to resolve the issues and come to a final disposition and distribu-

tion of the marital property. The court was not required to award a lump sum pension distribution simply because appellee preferred that method. We hold that the court did not abuse its discretion and appropriately determined that appellee's pension benefits shall be awarded on an "as, if, and when" basis.

## VII

 Appellee had a business relationship with the Bassler Hunt Partnership concerning the purchase of a property. According to the testimony adduced at trial, appellee entered into a written contract with the Bassler Hunt Partnership and received funds in connection with the transaction. The court apparently found that those funds were subsequently deposited as marital funds and used by both parties. A dispute eventually arose between Bassler Hunt Partnership and appellee concerning the monies paid to him, and the court found appellant liable for any future judgment or settlement relating to possible litigation with the Bassler Hunt Partnership.[3] Despite the trial court's lengthy and meticulously detailed Memorandum Opinion, it does not contain any discussion of the liability issue involving the agreement with the Bassler Hunt Partnership. The court's order merely states:

> [S]hould litigation ensue involving the Bassler Hunt Partnership, and such litigation pertains to the monies paid by the Bassler Hunt Partnership to [appellee] during the parties' marriage, each party shall bear equal responsibility for the payment of any judgment or settlement amount resulting from said litigation....

---

**3.** A lawsuit was eventually filed by the Bassler Hunt Partnership against appellee in the Circuit Court for Anne Arundel County, but the suit is not a part of the record in this appeal. Appellant included a copy of the complaint for that lawsuit in the record extract and appellee urges us to dismiss this case based on appellant's inclusion of a document that is not part of the record. Such an extreme remedy of dismissal is not necessary in this matter; rather, we will strike the complaint from the record extract and it will not receive our consideration. *See Community Realty Co., Inc. v. Siskos,* 31 Md.App. 99, 102, 354 A.2d 181 (1976).

Appellant claims that the court erroneously made her liable for any debts arising from litigation involving appellee and the partnership. Neither party cites any authority relating to this argument.

Appellant contends that, when appellant's counsel was examining appellee concerning his potential liability to the Bassler Hunt Partnership, the trial court limited his examination and from the bench announced that any liability relating to this issue was too speculative, thereby depriving appellant from providing further evidence of appellee's or appellant's liability in the matter. The following colloquy occurred at trial:

THE COURT: Well, Mrs.—is there a chance that [appellant] will be co-defendant in that case?

[APPELLEE]: If I'm sued, Your Honor, I'm gonna [sic] bring her in as the third party defendant because she received the benefits of the marital funds that they're claiming . . .

THE COURT: Well, the contract was entered into by the two of you, right?

[APPELLEE]: Yes.

THE COURT: And, the first right of refusal was . . .

[APPELLANT'S COUNSEL]: No. No, Judge.

THE COURT: . . . part of that contract?

[APPELLEE]: No, that . . .

[APPELLANT'S COUNSEL]: Excuse me, Judge. That's . . .

[APPELLEE]: If you—if Your Honor recall

. . .

[APPELLANT'S COUNSEL]: . . . it's not a contract having anything to do with [appellant].

. . .

THE COURT: This is a different piece of property altogether.

[APPELLEE]: Yes, Your Honor, completely different. It was eight-hundred-acre farm [sic]—in Howard County....

. . .

THE COURT: So, the proceed[s] were marital proceeds?

[APPELLEE]: Yes, Your Honor.

THE COURT: All right.

. . .

[APPELLANT'S COUNSEL]: And do you deny that you owe any of that money?

[APPELLEE]: I think the position I've taken now would—it would be foolish to put on the record what our position is except that it's barred by the statute of limitations.

[APPELLANT'S COUNSEL]: And, do you believe that to be a valid defense?

[APPELLEE'S COUNSEL]: Objection, it's (unintelligible). I'd rather not—not . . .

. . .

I'd rather not have him to go into that now, Your Honor.

THE COURT: I agree.

[APPELLANT'S COUNSEL]: May I assume, then, that the [c]ourt is not gonna [sic] take into account a Four–Hundred–Thousand–Dollar item of claimed liability on the [appellee's] financial statement in deciding this case?

THE COURT: Well, it's been disclosed to the [c]ourt that it's out there as a lurking possibility, but it's too speculative.

[APPELLANT'S COUNSEL]: Thank you, Your Honor.

THE COURT: I mean, even if a—if thunder struck and there wasn't [sic] a judgment, it might not be Four Thousand, it might be Four Hundred Dollars. Who knows?

[APPELLANT'S COUNSEL]: That's my point. Thank you.

THE COURT: Far too speculative.

 When the court calculates a monetary award, it must first follow the mandates of F.L. §§ 8–203–8–205. This involves, 1) deciding what property is or is not marital, 2) determining the value of all property deemed marital, and 3) calculating if a division of the marital property according to its title will be fair. *Innerbichler v. Innerbichler*, 132 Md.App. 207, 228, 752 A.2d 291 (2000). If such a division would be unfair, the court is authorized to grant a monetary award to balance any inequities. *Id.* Whether property is marital property is a question of fact and we will only disturb the trial court's factual finding concerning marital property if it is clearly erroneous. *Id.* at 229, 752 A.2d 291. If the court's finding is supported by substantial evidence, it cannot be found to be clearly erroneous. *Id.* at 230, 752 A.2d 291.

 In making a determination as to the value of marital property, the amount of marital debt associated with that marital property must be taken into consideration. *Schweizer v. Schweizer*, 301 Md. 626, 636–37, 484 A.2d 267 (1984). "[A] 'marital debt' is a debt which is directly traceable to the acquisition of marital property. Conversely, a 'nonmarital debt' is a debt which is not directly traceable to the acquisition of marital property." *Id.* In *Schweizer*, the Court of Appeals explained that a nonmarital debt may be considered in the third step of determining a monetary award. *Id.* at 637, 484 A.2d 267. The Court remanded the case, directing the trial court to 1) determine what portion of the husband's indebtedness was a marital debt, directly traceable to the acquisition of marital property, 2) redetermine the value of all marital property in relation to any marital debt; and 3) redetermine the monetary award, based on the statutory factors, F.L. § 8–205(a), specifically the impact of any nonmarital debt on the economic circumstances of the husband. *Id.* at 638, 484 A.2d 267.

In the case *sub judice,* the potential liability appellee faced from this transaction was listed on his financial statement. It is, therefore, a potential debt, albeit speculative. In our review of the record, however, we can find no determination by the trial court of whether this potential debt is marital or nonmarital. Based on the court's order, which imposed one-half of the liability on appellant, it obviously concluded that it was marital property. The record, however, contains absolutely no consideration by the trial court of this potential liability. Aside from the sole testimony of appellee that the proceeds from the transaction were marital proceeds, and the subsequent protestations from appellant's counsel that they were not, the court had no substantial evidence before it concerning this transaction to determine if the potential debt resulting therefrom was marital or nonmarital. The three-step analysis to determine what property is marital or nonmarital is not discretionary with the court, but is a requirement. *Caccamise v. Caccamise,* 130 Md.App. 505, 515, 747 A.2d 221 (citing *Alston v. Alston,* 331 Md. 496, 629 A.2d 70 (1993)), *cert. denied,* 359 Md. 29, 753 A.2d 2 (2000).

Upon our review of the record, there is no such analysis by the court. The court itself, however, after hearing the limited testimony provided on this issue, concluded from the bench that the liability with the Bassler Hunt Partnership was "far too speculative." In our recent opinion, *Innerbichler v. Innerbichler, supra,* we held that the court did not err in refusing to consider a potential tax liability when determining the monetary award because, based on the evidence, the liability was merely a possibility and too speculative to make it a valid consideration in adjusting the equities between the parties. *Innerbichler,* 132 Md.App. at 237–39, 752 A.2d 291.

Accordingly, we hold that the court was clearly erroneous in imposing one-half the liability of the potential lawsuit against appellant from the Bassler Hunt Partnership because the court's ruling was not based on substantial evidence. The contract in dispute was not placed into evidence; the only testimony relating to the funds being marital came from appellant, who clearly had an interest in identifying the funds

as such; and, dispositive of the issue, the trial court expressed its reservations from the bench that the liability involved was too speculative, and indicated to appellant's counsel that it would not take appellee's claimed liability into account in deciding the case. The court's ruling that the liability was too speculative should have removed the potential liability from consideration as marital debt. We, therefore, reverse the court's order imposing one-half of any liability on appellant for any litigation or ultimate settlement that would come from appellee's property transaction with Bassler Hunt Partnership. We remand the case for further consideration by the trial court of what effect this error may have had on its calculation of the monetary award or alimony.

## VIII

Appellant next disputes the trial court's orders dated September 27 and October 26, 1999 permitting the court-appointed trustee to retain the same powers as contained in the August 31, 1995 order. The orders of September and October 1999 state "[t]he Trustee shall continue to have all of those powers enumerated in the [c]ourt's Order of August 31, 1995." Appellant points out that the majority of the powers contained in the 1995 order are moot because they have already been performed. She explains that two of the provisions, however, are in contradiction with the court's finding and are, therefore, in error. The August 31, 1995 order provides, in pertinent part:

**ORDERED**, that **DAVID A. CARNEY**, as the Trustee in the above-referenced case, is empowered with the following rights and duties:

. . .

6. To disburse the funds held by Trustee for the following purposes:

e. Repayment of loans made from the Timothy E. Welsh, Retirement Account, for the expenses advanced

on behalf of [appellant] and [appellee] in the planning, subdivision, and improvement of the Property; and

f. Payment of monthly expenses associated with the Property, including but not limited to utilities, real property taxes, insurance premiums, lawn care, advertising, trash collection, storage, security, maintenance, and repairs....

Appellant's real concern is how the court's order of August 31, 1995, in conjunction with its subsequent findings and orders, affects expenses incurred prior to the divorce. She argues:

[Appellant's] only motive in seeking to retain the power granted to the Trustee under the August 31, 1995 Order would be to have the Trustee deduct the pre-divorce expenses and development costs paid by Husband (with marital funds) from the proceeds of sale and to pay the same to him before dividing the remaining balance equally between the parties.

She explains that, in the court's opinion issued in September 1999, it specifically found that the husband was not entitled to reimbursement for expenses before the divorce (Crawford credits).

A review of the chronology of the court's various orders in this case is illuminative of our discussion.

1) August 31, 1995—the court issues an order authorizing payments for expenses relating to the property.

2) December 2, 1996—the court issues an order specifically authorizing the trustee to reimburse appellee "for payment of the obligations of the parties from March 31, 1995, to August 31, 1995, in the amount of $35,859.72, which monies [appellee] advanced on behalf of the parties for those monthly expenditures involving the Property as are included in the [c]ourt's Order of August 31, 1995."

3) September 27, 1999—court issues its order granting the parties an absolute divorce and specifically vacating its order of December 2, 1996.

As we explain, *infra*, the court properly vacated its order of December 2, 1996, and the provisions contained therein are of no relevance. The order of August 31, 1995, therefore, must be read in conjunction with the order of September 27, 1999. While it is true that the court encompasses the entire August 1995 order and portions of that are no longer applicable, we do not see the authority granted the trustee as overreaching. The court specifically found that appellee paid the expenses for upkeep of Font Hill with marital funds and was, therefore, not entitled to any contribution by appellant. The powers enumerated in the order of August 31, 1995, therefore, limit what type of expenses the trustee is authorized to distribute. We do not read the orders as conflicting; rather, they supplement each other and must be read and carried out in conjunction with one another. The trustee must adhere to the findings of the court to determine what kind of expenses he is authorized to disburse to the parties or others for the post-divorce maintenance of the Font Hill property until it is sold. We do not view the court's action as an abuse of discretion, nor is it clearly erroneous. Should appellant dispute the disbursements of the trustee, she may bring that before the trial court at the proper time.

## IX

 Appellee contends that the circuit court erred when it vacated its order of December 2, 1996. He explains that, due to the mandate we issued in the interlocutory appeal, the court did not have the authority to vacate that order. In *Welsh v. Welsh*, 117 Md.App. 756, No. 103, September Term, 1996,[4] appellant complained that the court had granted appellee's motion for payment of fees associated with maintaining the Font Hill property and reimbursement for attorney's fees he incurred to move the court to appoint a trustee to handle disbursements of funds in the proceedings without a hearing.

---

4. In the interlocutory appeal, as in this appeal, Mrs. Welsh was the appellant and Mr. Welsh was the appellee. We shall, therefore, continue to refer to them in this manner when referring to the previous appeal filed in this case.

We vacated the court's granting of attorney's fees because the record contained no factual findings as required under the Maryland Rules and the Maryland Code allowing such fees to be imposed.

Concerning appellant's request to reverse the court's ruling on the award of fees without a hearing, we stated:

> This case comes before this Court in the posture of ongoing divorce proceedings. The circuit court will ultimately hold a final hearing on the merits. Therefore, appellant will have ample opportunity in that forum to make her argument that the court erroneously approved payment in favor of [appellant]. After hearing all of the evidence, the court may, in its discretion, order a monetary award to appellee or otherwise adjust any inequities. We find, then, that the lower court has not granted summary judgement but, rather, has approved certain orders in the course of ongoing divorce proceedings. It is, therefore, premature for this Court to interfere, and we will await a final divorce judgment by the circuit court.

Our mandate affirmed in part, reversed in part, and vacated in part and remanded the case to the Circuit Court for Carroll County. Thereafter, on remand, the trial court vacated its judgment of December 2, 1996, which had granted appellee the expenditures for maintenance to Font Hill.

Appellee now posits that the circuit court was without authority to vacate that order. He in essence reads our mandate to affirm the portion of the order granting him fees to upkeep Font Hill and only vacating the attorney's fees, meaning the court may not disturb an order that we have affirmed. Appellee is misguided. We specifically stated that the nature of the ongoing proceedings of the divorce precluded us from deciding the matter. Our holding simply meant that the court did not err under Maryland Rule 2–311(f)(2000) for not holding a hearing on the matter because there was still a chance for appellant to be heard. Appellee, citing *Kline v. Kline*, 93 Md.App. 696, 614 A.2d 984 (1992), points out that the law of the case doctrine states that an appellate ruling be-

comes the law of the case and is controlling in any further proceedings. Additionally, he reminds us that an issue raised in a previous appeal may not be raised on a subsequent appeal. We do not dispute the law of the case doctrine, but appellee has simply misinterpreted our holding.

The issue before us on appeal in 1997 was whether the court erred by granting appellee's motion for fees without a hearing. We held that it did not because a hearing could still be conducted. We further opined that, once a hearing on the merits occurred, the court would have the opportunity to review all of the evidence and make appropriate adjustments as it deemed necessary. Because of the ongoing nature of the case, the circuit court retained authority over the final disposition of its orders and the marital property. The issue previously before us on appeal did not decide anything related to the substance of the court's award of fees for maintenance of Font Hill.

Our mandate clearly provided the trial court with the discretion, after a trial on the merits, to make any adjustments it deemed necessary concerning its order and we see no abuse of that discretion. The court, in balancing the equities, exercised its authority to vacate its previous order and our mandate in the previous appeal in no way limited its authority to make such a decision.

## X

Lastly, appellee posits that the circuit court erroneously granted appellant a divorce based on a two-year separation when it was appellee, not appellant, who provided the corroborating witness to prove the two-year separation. He argues that he should have been granted the divorce based on a two-year separation because he provided the witness.

The court's order granted appellant an absolute divorce on the ground of a two-year separation. F.L. § 7–103(a)(5). As observed, *supra,* the court was clear that it found that the relationship between the parties had deteriorated long before the couple's separation in April 1994. The court specifically

refused to grant appellee a divorce as requested in his counterclaim on grounds of constructive desertion or abandonment. The court stated that it would "accordingly grant *the parties* a divorce based upon a two-year separation." (Emphasis added.) The court's order, however, grants the divorce only to appellant. While we recognize that it was appellee's witness who corroborated a two-year separation, we do not find any authority that would limit the court's authority to grant only appellee the divorce. Given the deteriorated state of the parties' marriage at the time appellant moved out of the marital home, it is reasonable that the court would grant the original plaintiff in the case the divorce, because at any time prior to that, appellee could have initiated the proceedings. We liken appellee's argument to the one presented in *Quigley v. Quigley*, 54 Md.App. 45, 456 A.2d 1305 (1983), wherein the appellant complained that she was not granted the divorce on the basis of adultery. We observed:

> She does not argue that a divorce was not legally merited, but that she was entitled to obtain it as a matter of preference. Apparently, she would have us establish a priority, or pecking order of conflicting grounds proportionate to a badder-is-better standard.... We find the reasoning absurd and based primarily upon the animosity that has festered over the years demanding now that the court point the finger of fault; more in vindictiveness than as vindication, considering that appellee never denied having initiated the dissolution and has admitted the adultery.

*Id.* at 49, 456 A.2d 1305.

While appellee's contention that the court erred in granting appellant the divorce is not based on the argument that there was a more justifiable ground, we see his argument as a circular one and one based on preference, rather than substance. He cites no authority for the proposition that, because his witness presented the corroborating evidence, he alone is entitled to be granted the divorce. The one-year separation and two-year separation grounds for divorce, as codified in F.L. § 7–103(a)(3) and(5), both provide a means for the parties to obtain a divorce without regard to fault. *Aronson v.*

*Aronson*, 115 Md.App. 78, 98, 691 A.2d 785, *cert. denied,* 346 Md. 371, 697 A.2d 111 (1997). We do not see the court's decision to grant the divorce based on the no-fault grounds of a two-year separation to appellant as an abuse of discretion and, accordingly, the trial court's order granting appellant the divorce shall stand.

**JUDGMENT OF THE CIRCUIT COURT FOR CAR-ROLL COUNTY REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED FOR FURTHER FACT-FINDING CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ¾ BY APPELLEE AND ¼ BY APPELLANT.**